**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

PATRICIA L. JENSEN,

          Plaintiff,

vs.

IOC BLACK HAWK COUNTY INC.,
d/b/a ISLE CASINO HOTEL
WATERLOO,

          Defendant.

No. 15-CV-2082-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

*I.*    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*   *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*III.*  *SUBJECT MATTER JURISDICTION* . . . . . . . . . . . . . . . . . . . . . . **3**

*IV.*  *SUMMARY JUDGMENT STANDARD* . . . . . . . . . . . . . . . . . . . . . **3**

*V.*   *MOTIONS TO STRIKE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

    *A.*   *IOC Motion to Strike* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
        *1.*   *Hearsay* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
        *2.*   *Contradiction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        *3.*   *Speculation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
    *B.*   *Jensen Motion to Strike* . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

*VI.*  *RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . **11**

    *A.*   *Work History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
    *B.*   *Harassment Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
    *C.*   *Termination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

*VII.* *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

    *A.*   *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
        *1.*   *Title VII retaliation* . . . . . . . . . . . . . . . . . . . . . . . . **15**
        *2.*   *ICRA retaliation* . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
    *B.*   *Causal Connection* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

      **1.**     *Title VII but-for causation* . . . . . . . . . . . . . . . . . . . . . . . **19**
          *a.*     *Targeting and increased scrutiny* . . . . . . . . . . . . . . . **20**
          *b.*     *Inaccuracy on termination report* . . . . . . . . . . . . . . **23**
      **2.**     *ICRA "significant factor" causation* . . . . . . . . . . . . . . . . . **27**
  **C.**    **Pretext** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**VIII.**  **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

## I. INTRODUCTION

The matters before the court are Defendant IOC Black Hawk County, Inc.'s ("IOC") "Motion for Summary Judgment" ("Motion") (docket no. 18) and "Motion to Strike" ("IOC Motion to Strike") (docket no. 30) and Plaintiff Patricia L. Jensen's "Motion to Strike" ("Jensen Motion to Strike") (docket no. 33).

## II. PROCEDURAL HISTORY

On August 3, 2015, Jensen filed a Petition (docket no. 3) in the Iowa District Court for Black Hawk County alleging retaliation in violation of "Title VII of the Civil Rights Act of 1964" ("Title VII") and the "Iowa Civil Rights Act" ("ICRA"). On September 4, 2015, IOC removed the case, bringing the instant action before the court. *See* Notice of Removal (docket no. 2). On September 17, 2015, IOC filed an Answer (docket no. 7). On July 29, 2016, IOC filed the Motion. On August 22, 2016, Jensen filed a Resistance (docket no. 22). On September 1, 2016, IOC filed a Reply (docket no. 27). On that same date, IOC filed the IOC Motion to Strike, requesting that the court strike "Jensen's Declaration in Support of Resistance" ("Jensen Declaration") contained in "Jensen's Appendix of Documents in Support of Resistance" ("Jensen Appendix") (docket no. 22-3). On September 7, 2016, Jensen filed the Jensen Motion to Strike, requesting that the court strike "IOC's Reply to Jensen's Response to IOC's Statement of Facts" ("IOC Reply to Facts") (docket no. 27-3). On September 8, 2016, IOC filed a Resistance to the Jensen Motion to Strike (docket no. 35). On September 19, 2016, Jensen filed an untimely Resistance to the IOC Motion to Strike (docket no. 36). *See* LR 7(e) (setting resistance deadline for fourteen days after the filing of a motion). On September 29, 2016, IOC filed

an untimely Reply in Support of the IOC Motion to Strike (docket no. 37). *See* LR 7(g) (setting reply deadline for seven days after the filing of a resistance). Neither party requests oral argument on the Motion or the Motions to Strike and the court finds that oral argument is unnecessary. The matters are fully submitted and ready for decision.

## III. SUBJECT MATTER JURISDICTION

The court has original jurisdiction over the Title VII claim because it arises under the United States Code. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over the ICRA claim because it is so related to the Title VII claim that it forms part of the same case or controversy. *See* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .").

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts

showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324).

The court must view the record in the light most favorable to the non-moving party and afford it all reasonable inferences. *See Schmitt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case necessarily renders all other facts immaterial.'" *B.M.* ex rel. *Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013) (alteration omitted) (quoting *Celotex*, 477 U.S. at 322-23).

## V. MOTIONS TO STRIKE

Because both Motions to Strike implicate the factual record by seeking to strike portions of the evidentiary record or arguments relating to the evidentiary record, the court shall address the Motions to Strike before proceeding to state the relevant facts.

### A. IOC Motion to Strike

In the IOC Motion to Strike, IOC seeks to strike the Jensen Declaration in its entirety for failure to comply with Federal Rule of Civil Procedure 56(c)(4). Specifically, IOC argues that each paragraph of the declaration (1) contains inadmissible hearsay; (2) contradicts Jensen's prior deposition testimony; and/or (3) states an opinion, speculation or legal conclusion to which Jensen lacks personal knowledge. *See* IOC Motion to Strike at 2. Jensen resists the IOC Motion to Strike on various grounds. *See generally* Resistance to the IOC Motion to Strike. Despite its untimeliness, the court will consider the arguments included in the Resistance to the IOC Motion to Strike. However, the court will not consider IOC's untimely Reply in Support of the IOC Motion to Strike.

Federal Rule of Civil Procedure 56(c)(4) states that "[a]n affidavit or declaration

4

used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A party may object to materials submitted in opposition to summary judgment on grounds that such materials "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)(2)). When a party objects to materials submitted to oppose summary judgment, "the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.* (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment). Additionally, to the extent that an affidavit directly contradicts earlier deposition testimony, the court may disregard such affidavit and it may be stricken. *See City of St. Joseph, Mo. v. Sw. Bell Tel.*, 439 F.3d 468, 475-76 (8th Cir. 2006).

### 1. *Hearsay*

IOC argues that numerous paragraphs should be stricken from the Jensen Declaration because they contain inadmissible hearsay. *See* Brief in Support of IOC Motion to Strike (docket no. 30-1) at 4. Jensen argues that the statements attributed to IOC employees John Stanford, David Taylor, Cory Kozelka, Rachael Nyland, Nyland's partner and unidentified others are not hearsay and should not be stricken. *See* Resistance to the IOC Motion to Strike at 5-7, 9-12. An opposing party's out-of-court statement offered for its truth is not hearsay if it "is offered against [the] opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). "This rule requires the proffering party to lay foundation to show that an otherwise excludible statement relates to a matter within

the scope of the agent's employment." *Gulbranson v. Duluth, Missabe & Iron Range Ry. Co.*, 921 F.2d 139, 142 (8th Cir. 1990). A matter may be within the scope of employment of multiple employees, even if those employees are not direct decisionmakers. *See Holland v. Washington Cty., Ark.*, No. 15-CV-5088, 2016 WL 1466556, at *5 (W.D. Ark. Apr. 14, 2016) (citing *Wilson v. Budco*, 762 F. Supp. 2d 1047, 1061 (E.D. Mich. 2011)).

Here, Stanford, Taylor, Kozelka, Nyland, Nyland's partner and the unidentified co-workers are all employees of IOC and their statements are being offered against IOC. Therefore, the statements are admissible under Rule 801(d)(2)(D) if Jensen can lay foundation to show that the statements were made within the scope of their employment. The record establishes that Stanford is IOC's Employee Relations Director, Taylor is the Facilities/Security Manager and Kozelka is Lead Supervisor. It is clear to the court from their titles and their involvement in the events underlying this case (as reflected in the record) that Stanford, Taylor and Kozelka all carried certain supervisory and managerial authority over IOC's security staff, including Jensen. As such, the court finds that statements by Stanford, Taylor and Kozelka about the following topics were all made within the scope of their roles as employees with supervisory or managerial roles and are not hearsay: (1) warning about possible co-worker retaliation (paragraphs 2 and 3); (2) refusing to interfere with employees' personal relationships (paragraph 8); (3) ordering employees not to discuss co-worker relationships with other co-workers (paragraph 10 and 11); (4) notifying employees about pending investigations and issuing suspensions (paragraphs 14 and 18); (5) notifying employees of termination (paragraphs 16 and 18); and (6) preparing documents memorializing the termination (paragraphs 17 and 18).[1]

---

[1] Although Jensen has not formally laid foundation with respect to specific duties performed by Stanford, Taylor and Kozelka, the record clearly indicates that they exercised a significant degree of authority over IOC's security staff. In any event, Jensen's showing is sufficient to satisfy her burden of showing that the statements could

(continued…)

Other statements directly attributed to IOC employees and objected to by IOC—including general details of conversations between Jensen and Taylor, Nyland and Nyland's partner (paragraphs 8 and 11) and attitudes held by unidentified co-workers (paragraphs 2 and 3)—do not appear to be within the scope of their employment. However, the court finds that they are not hearsay because they are not being offered for their truth, but are instead being offered to show their effect on Jensen or to place events into context. *See* Fed. R. Evid. 801(c)(2). Therefore, the statements directly attributed to IOC employees are not hearsay and shall not be stricken.

Jensen concedes that the statements attributed to Sandy Daman are hearsay but argues that they can be presented in admissible form at trial. Resistance to the IOC Motion to Strike at 7-9. Daman's statements relay statements made by another declarant, Brian Lucas. *See* Jensen Appendix at 23. Therefore, they create two levels of hearsay: (1) Jensen stating what Daman said, and (2) Daman stating what Lucas said. Jensen's counsel states that Daman will be subpoenaed to testify at any eventual trial, eliminating the first level of hearsay. *See* Exhibit 2 to Resistance to the IOC Motion to Strike (docket no. 36-2) ¶ 8; *see also Gannon*, 684 F.3d at 793. With respect to the second level of hearsay, the court finds that Lucas's statements are admissible as non-hearsay under Rule 801(d)(2)(D). As with the employees discussed above, Lucas is an employee of IOC and his statements are being offered against IOC. Jensen states that Lucas is a Security Supervisor and that his role requires him to act as a liaison between security staff and management. To that end, Lucas's statements warning Jensen that certain of her co-workers responded negatively to Jensen's participation in protected conduct (paragraphs 4 and 5) implicate working relationships among the security staff and, as such, implicate a matter within the

---

[1](...continued)
be presented in admissible form at trial. *See Gannon*, 684 F.3d at 793.

scope of his employment.[2]  Therefore, the statements made by Lucas through Daman are not hearsay and shall not be stricken.  Accordingly, the IOC Motion to Strike shall be denied as to its arguments that the Jensen Declaration includes hearsay.

### 2.  *Contradiction*

IOC argues that certain paragraphs should be stricken from the Jensen Declaration because they directly contradict Jensen's testimony at her deposition.  Courts "must use extreme care" when deciding whether an affidavit directly contradicts prior testimony and warrants striking.  *City of St. Joseph*, 439 F.3d at 476.  An affidavit must not be stricken simply because "the affiant needs to explain portions of [her] deposition testimony that were unclear."  *Id.*  Here, IOC points to three paragraphs in the Jensen Declaration that purportedly contradict Jensen's deposition testimony.  *See* Brief in Support of IOC Motion to Strike at 5.  In these paragraphs, Jensen disputes IOC's characterizations of her deposition testimony included in "Defendant's Statement of Undisputed Facts" ("IOC Statement of Facts") (docket no. 18-1).  Specifically, she disputes that she testified that Nyland's partner "was" a pedophile or serial killer (paragraph 8)  and clarifies her testimony about her supervisors' motivations for terminating her (paragraphs 12 and 13).  *See* Jensen Appendix at 23-26.  In the Jensen Declaration, Jensen clarifies that she only ever stated that Nyland's partner "could be" a pedophile or serial killer and that she detected no retaliatory animus in her supervisors *until* they terminated her.  *Id.*  The court finds that these portions of the Jensen Declaration do not directly contradict Jensen's deposition testimony, but instead clarify portions of the deposition testimony.  Accordingly, the IOC Motion to Strike shall be denied as to its argument that the Jensen Declaration directly contradicts Jensen's deposition testimony.

---

[2] As noted above, although Jensen does not describe specific duties performed by Lucas, her showing is sufficient to satisfy her burden of showing that the statements could be presented in admissible form at trial.  *See Gannon*, 684 F.3d at 793.

### 3.    *Speculation*

Lastly, IOC argues that certain paragraphs should be stricken from the Jensen Declaration because they contain speculation unsupported by personal knowledge.    In paragraph 2, Jensen states that it was "common knowledge" that she was being targeted by certain co-workers.    *See* Jensen Appendix at 22.    Although she proceeds to describe conversations with her supervisors warning her of potential retaliation, she does not substantiate her conclusion that any targeting was "common knowledge."    Because it amounts to no more than a sweeping unsupported conclusion, the court shall strike the first sentence of paragraph 2, which contains the "common knowledge" statement.    Likewise, the court shall strike paragraph 6, in which Jensen speculates that, when Lucas warned her that "they" were out "to get" her, he was referring specifically to management plotting to retaliate against her.    *Id.* at 23.    Jensen argues that her interpretation "can be deduced definitively" because management staff were the only people with the authority "to get" Jensen.    Resistance to the IOC Motion to Strike at 2.    However, such deduction requires the logical leap that "to get" is synonymous with "to terminate."    It is apparently true that IOC's managers were the only people authorized to terminate Jensen.    However, the court declines to assume that "to get" is coterminous with "to terminate."    Absent such assumption, Jensen's interpretation that the vague warning that "they" were out "to get" her referred specifically to management rests solely on speculation.    As such, it will not be considered.    The court shall further strike the first and last sentences of paragraph 17, which insinuate that there was never an investigation into the events that culminated in Jensen's termination.    *See* Jensen Appendix at 26.    Jensen does not profess any personal knowledge that there was no investigation, but simply points to vague circumstances from which she speculates that no investigation occurred.    The court declines to consider such speculation dressed up as personal knowledge.    With respect to the other portions of the Jensen Declaration that IOC argues lack personal knowledge (paragraphs 3, 12 and 13),

the court finds that such portions do not warrant striking. Therefore, the IOC Motion to Strike shall be granted in part and denied in part as to its arguments that the Jensen Declaration includes speculation or opinion unsupported by personal knowledge.

## B. Jensen Motion to Strike

In the Jensen Motion to Strike, Jensen seeks to strike the IOC Reply to Facts for failure to comply with Local Rule 56(d). Jensen Motion to Strike at 1. IOC resists the Jensen Motion to Strike on grounds that the IOC Reply to Facts serves "to alert the court, pursuant to [Federal Rule of Civil Procedure] 56(c)(2), that [Jensen's] denials are not based on admissible record evidence, violate the Federal Rules, and equate to admissions." Resistance to Jensen Motion to Strike at 1. IOC proceeds to argue that the IOC Reply to Facts highlights the same purported deficiencies in the Jensen Declaration that are the basis for the IOC Motion to Strike. *Id.* at 2-3.

Local Rule 56(d) provides that the party that filed a motion for summary judgment "must, within 7 days after service of the resisting party's statement of additional facts, file a reply in which the moving party expressly admits, denies, or qualifies each of the resisting party's numbered statements of additional fact." LR 56(d). The rule further provides that the moving party "may, without leave of court, file a reply brief" and "must file a supplemental appendix" if additional materials are relied upon in the reply brief. *Id.* Local Rule 56(d) does not expressly contemplate any additional filings. As discussed above, Federal Rule 56(c)(2) permits a party to object to summary judgment materials that "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

Here, the IOC Motion to Strike and the IOC Reply to Facts amount to duplicative filings. As IOC concedes in its Resistance to the Jensen Motion to Strike, both filings serve only to attack the Jensen Declaration for purported violations of Federal Rule 56(c)(4). Therefore, one such filing shall be stricken. *See Ehler v. Wheaton Franciscan*

*Med. Plan*, 2009 WL 1097070, at *2 (N.D. Iowa 2009) (striking duplicate exhibits). The court has already discussed the IOC Motion to Strike above, effectively mooting the duplicative arguments in the IOC Reply to Facts. Accordingly, the Jensen Motion to Strike shall be granted. The IOC Reply to Facts shall be stricken and will not be considered by the court.

## VI. RELEVANT FACTUAL BACKGROUND

### A. Work History

Jensen began employment with IOC as a security officer at the Isle Casino Hotel Waterloo on approximately January 16, 2009. IOC Statement of Facts ¶ 1. When Jensen began her employment with IOC, she received and signed the "Standards of Team Member Conduct." "Defendant's Appendix in Support of Summary Judgment" ("IOC Appendix I") (docket no. 18-2) at 28 (formatting omitted). The Standards of Team Member Conduct states that employees are "subject to disciplinary action up to and including termination" for various behaviors, including "[i]nsubordination or refusal to obey a directive of a supervisor." *Id.*

In her 2009 annual performance review, Jensen received a "[t]otal [r]ating" of 3.49 on a five-point scale, indicating that she "[m]eets [e]xpectations." IOC Appendix I at 25. The 2009 review included comments that Jensen "can be abrupt with [team members] while performing her duties, even though she has a job to do it is how she talks to the [team member] that gets complaints," *id.* at 23, and "is able to communicate effectively in both oral and written communication," *id.* at 24, among other performance-related observations. Jensen's 2010 annual performance review included comments that "[t]here is room for improvement when it comes to showing respect to others" and that Jensen "has shown disrespect to Supervisors in front of other officers and hung up the phone on fellow officers." IOC Statement of Facts ¶ 3; IOC Appendix I at 26.

On March 22, 2011, Jensen was issued a written "First Warning." IOC Appendix

I at 30.  The written warning described that Jensen "was insubordinate towards" Lead Security Officer Nyland during a discussion about chain-of-command procedures.  *Id.*  The written warning included a "[c]oaching [p]lan," which states that Jensen "must understand the proper chain-of-command, and listen to direct orders and coachings issued to her by her superiors."  *Id.*  The written warning further described the "[c]onsequences (if any) for uncorrected behavior" to be "[f]urther disciplinary action up to and including termination."  *Id.*

## B.  Harassment Complaint

On March 28, 2011, Jensen told Security Supervisor Lucas that another security supervisor, Domingo Jaramillo, made an inappropriate sexual comment to her.  IOC Statement of Facts ¶ 6.  IOC investigated Jensen's complaint and Jaramillo admitted that he did make the inappropriate comment.  *Id.* ¶ 7.  On April 4, 2011, IOC terminated Jaramillo as a result of the harassment complaint and investigation.  *Id.* ¶ 8.

Jaramillo was "well liked" by certain IOC employees.  Jensen Appendix at 17 (Nyland deposition testimony); "Defendant's Appendix in Support of Reply" ("IOC Appendix II") (docket no. 27-1) at 10 (Stanford deposition testimony).  After IOC terminated Jaramillo, Employee Relations Director Stanford and Facilities/Security Manager Taylor advised Jensen that she should report to them if she encountered any "rumors" or indications of retaliation connected with her harassment complaint against Jaramillo.  IOC Appendix II at 9-10 (Stanford deposition testimony); *id.* at 15 (Taylor deposition testimony).  According to Jensen, in the period following Jaramillo's termination, she endured increased scrutiny of her job performance and was told by others that unidentified persons ("they") were "out to get her" and were "watching everything." *See* Jensen Appendix at 22-23 (Jensen Declaration).  Jensen "complained about all of this" to Stanford.  *Id.* at 23.  During this period, Jensen did not believe that Stanford or Taylor harbored any retaliatory animus toward her or were "targeting" her.  *Id.*; *id.* at 13-14

(Jensen deposition testimony); *see also* IOC Appendix I at 21 (Jensen deposition testimony).

On June 15, 2011, Jensen was issued a "Written Coaching." IOC Appendix I at 31. The written coaching described that Jensen was "upset" with how a co-worker, Mike George, performed lost-and-found procedures and directly approached George with her concerns rather than raising the issue with a supervisor pursuant to chain-of-command procedures. *Id.* The written coaching included a "[c]oaching [p]lan," which states that "[s]upervisors will review chain of command with [Jensen] so she understands how to properly deal with problems that arise at work." *Id.* The written coaching further described the "[c]onsequences (if any) for uncorrected behavior" to be "[f]urther disciplinary actions up to and including termination." *Id.* George "was a good friend" of Jaramillo's. Jensen Appendix at 8 (Jensen deposition testimony).

### C. Termination

On August 23, 2011, Jensen and Nyland were working together at the turnstiles of the casino. While they were working together, a co-worker brought up the subject of Nyland's relationship with another co-worker employed by IOC at the casino. IOC Appendix I at 52 (Nyland deposition testimony). Upon learning of Nyland's relationship, Jensen voiced concerns that Nyland was "rushing into it and maybe . . . [she] should reconsider." *Id.* at 14 (Jensen deposition testimony). According to Nyland, during the conversation, Jensen voiced her concerns by asking questions such as, "[h]ow do we know he's not a killer?" *Id.* at 52 (Nyland deposition testimony).

Shortly after her conversation with Nyland, Jensen discussed Nyland's relationship with Taylor. Jensen Appendix at 4 (Jensen deposition testimony). Jensen encouraged Taylor to "take . . . Nyland under his wing, be like a father figure to her, and tell her to slow down" in her relationship with the co-worker. *Id.* at 24 (Jensen Declaration). Taylor stated that he would not do so because Nyland is "a big girl." *Id.* Jensen then expressed

that she did not know anything about the co-worker that Nyland was involved with and that "[a]s far as we know, he could be a pedophile or a serial killer." *Id.* During the conversation, Taylor told Jensen not to speak with Nyland about her relationship. *Id.* Lead Supervisor Kozelka was present during Jensen's conversation with Taylor, although he did not participate. *Id.* Jensen describes the conversation with Taylor as "light." *Id.* After her conversation with Taylor, Jensen did not further criticize Nyland's relationship in front of Nyland. *See* IOC Appendix I at 55-56 (Nyland deposition testimony). However, Jensen and Nyland did have another conversation about some matter touching upon Nyland's relationship. *See id.* at 56; Jensen Appendix at 25 (Jensen Declaration).

On August 24, 2011, the day after her conversation with Jensen, Nyland left a voice message with Stanford complaining about Jensen's statements. *Id.* at 53-54 (Nyland deposition testimony); *see also id.* at 59 (disciplinary termination document stating that "Nyland called HR on 8/24/11 to complain about the conversation she had with . . . Jensen"). Upon receiving the voice message, Stanford proceeded to investigate the complaint by speaking with Nyland and Jensen and by soliciting a statement from Kozelka about Jensen's conversation with Taylor. *See id.* at 33-37 (Stanford deposition testimony).[3] Jensen was "off work" from August 25 through August 27, 2011. Jensen Appendix at 26 (Jensen Declaration). On August 27, 2011, Taylor informed Jensen that she was being suspended pending the conclusion of Stanford's investigation. *Id.* at 26-27

As a result of his investigation, Stanford determined that Jensen had continued to discuss Nyland's relationship with Nyland after Taylor instructed her not to. IOC

---

[3] In the Jensen Declaration, Jensen states that, "[i]f there was an 'investigation' of the conversation [with Nyland], no one contacted me to participate in it." Jensen Appendix at 26. However, in her deposition, Jensen testified that Stanford approached her to discuss her conversation with Taylor. *Id.* at 5. Affording Jensen all reasonable inferences, this evidence establishes that Stanford did in fact speak with Jensen as part of his investigation—though he did not address Jensen's statements to Nyland, but instead addressed the related matter of Jensen's conversation with Taylor.

Appendix I at 38 (Stanford deposition testimony). Stanford discussed his investigation with Taylor and they collectively decided to terminate Jensen. *Id.* at 39-40. On August 26, 2011, Taylor prepared a "[d]isciplinary termination" report describing the events of Jensen's conversations with Nyland and Taylor. *Id.* at 59. The termination report stated:

> On Tuesday 8/23/11 Officer Jensen was stationed at turnstile, Lead Officer Nyland was in the area of turnstile. A [team member] asked [Nyland] about who she was seeing, Jensen then stepped in telling Nyland she had already talked to Taylor and Kozelka saying they needed to interfer[e] with [Nyland's] relationship and guide and direct her. I had given [Jensen] direct orders not to speak to . . . Lead Officer Nyland reference [sic] Nyland's personal life due to the disruption it would cause in the security department. [Jensen] decided to disregard my direct order. Lead Officer Nyland called HR on 8/24/11 to complain about the conversation she had with Officer Jensen.

*Id.* The termination report also references the "First Warning" that Jensen had received on March 22, 2011 for insubordination to Nyland. *Id.* On August 30, 2011, Taylor informed Jensen that she was being terminated. Jensen Appendix at 26 (Jensen Declaration). On September 1, 2011, IOC drafted and sent a termination letter to Jensen, formally terminating her employment as of August 26, 2011. *Id.* at 28.

## VII. ANALYSIS

Jensen alleges that IOC terminated her in retaliation for her harassment complaint against Jaramillo, in violation of Title VII and the ICRA. IOC argues that the court should grant summary judgment in its favor on both claims.

### A. Applicable Law

#### 1. Title VII retaliation

Title VII makes it unlawful for an employer to retaliate against an employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation" into a Title VII violation. 42 U.S.C. § 2000e-3. In cases

where the plaintiff offers "no direct evidence of retaliation," retaliation claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *DePriest v. Milligan*, 823 F.3d 1179, 1187 (8th Cir. 2016). The *McDonnell Douglas* framework first requires the plaintiff to establish a prima facie case of retaliation by showing: "(1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two." *Id.* (quoting *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 (8th Cir. 2014)). "[T]o show a causal connection, a plaintiff must show that her protected activity was a but-for cause of her employer's adverse action." *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 888 (8th Cir. 2015) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. __, 133 S. Ct. 2517, 2534 (2013)). "If the plaintiff makes this prima facie showing, the employer must then rebut it by presenting evidence of a legitimate, non-retaliatory reason for the action it took against the plaintiff." *DePriest*, 823 F.3d at 1187 (internal quotation marks and alterations omitted) (quoting *Fiero*, 759 F.3d at 880). "If the employer satisfies this burden, the plaintiff is then obliged to present evidence that (1) creates a question of fact as to whether the employer's proffered reason was pretextual and (2) creates a reasonable inference that the employer acted in retaliation." *Id.* (internal quotation marks and alterations omitted) (quoting *Fiero*, 759 F.3d at 880).

### 2.    ICRA retaliation

Jensen argues that retaliation claims brought under the ICRA are subject to a distinct and less rigorous standard than the standard applicable under Title VII. *See* Resistance at 14-17. Specifically, Jensen contends that causal connection in an ICRA retaliation claim only requires a showing that the protected conduct was "a motivating factor" in the adverse employment action taken by the employer, rather than the but-for cause required under Title VII. *See id.* at 14.

Both the Iowa Supreme Court and the Eighth Circuit have recognized that the same

analytical framework typically applies under both Title VII and the ICRA. *See, e.g.*, *Banks v. Deere*, 829 F.3d 661, 665 n.4 (8th Cir. 2016) ("Given the kinship between the ICRA and Title VII, we, like the Iowa courts, normally 'analyze ICRA claims under the same analytical framework used for Title VII claims.'" (internal citation omitted) (quoting *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 913 n.5 (8th Cir. 2007))); *McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005) ("Because the ICRA is in part modeled after Title VII, we have traditionally looked to federal law for guidance in interpreting it."). Of course, Iowa courts are "not bound by federal law, despite consistent utilization of the federal analytical framework" when addressing ICRA claims. *Pippen v. State*, 854 N.W.2d 1, 18 (Iowa 2014) (quoting *Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003)). "The bottom line is that [the ICRA] is a source of law independent of [Title VII]." *Id.* at 30. As such, Iowa courts will deviate from federal law if it construes Title VII's protections in a manner that is inconsistent with the ICRA's command that it be "construed broadly." *See id.* at 28-30.

The Iowa Supreme Court has long held that, to establish causation for a retaliation claim under the ICRA, the plaintiff must show that the protected activity was "a 'significant factor' motivating the adverse employment decision." *Hulme v. Barrett*, 480 N.W.2d 40, 42 (Iowa 1992) (internal quotation marks omitted); *accord City of Hampton v. Iowa Civil Rights Comm'n*, 554 N.W.2d 532, 536 (Iowa 1996). Since *Hulme* and *City of Hampton* were decided, the Supreme Court of the United States has definitively held that but-for causation is the appropriate causation standard for retaliation claims under Title VII. *See Nassar*, 133 S. Ct. at 2528 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . ."). If the Iowa Supreme Court were to interpret the ICRA in absolute unison with federal interpretations of Title VII, then but-for causation would apply to ICRA retaliation claims in light of *Nassar*. However, as noted above, Iowa courts do not interpret the ICRA in such a lock-step fashion. Although

it does not appear that the Iowa Supreme Court has addressed *Nassar*'s impact on ICRA retaliation claims, the court considers *Hulme* and *City of Hampton* to remain good law for two reasons. First, in *Hulme*, the Iowa Supreme Court adopted the "significant factor" standard for ICRA retaliation claims despite the Eighth Circuit's long-time use of a standard equivalent to but-for causation in Title VII retaliation cases. *See Womack v. Munson*, 619 F.2d 1292, 1297 (8th Cir. 1980) ("[T]he employer may not be liable if the discharge would have taken place *even in the absence* of the protected activity." (emphasis added)). It is therefore clear that the Iowa courts affirmatively chose the "significant factor" standard over the but-for standard. Second, because the "significant factor" standard is more lenient than the but-for standard, it more closely adheres to the ICRA's statutory command that its protections "be construed broadly to effectuate its purposes." Iowa Code § 216.18(1); *see also Pippen*, 854 N.W.2d at 28-30. Therefore, in the absence of Iowa case law abandoning the "significant factor" standard, the court will proceed to apply the "significant factor" standard from *Hulme* and *City of Hampton* when addressing Jensen's claim under the ICRA.[4]

---

[4] The court is unpersuaded by Jensen's claim that the "motivating factor" standard applies to ICRA retaliation. Jensen argues that, because the Iowa Supreme Court has applied the "motivating factor" standard when addressing ICRA discrimination cases, it follows that it must apply the same standard to ICRA retaliation cases. *See* Resistance at 16. Such argument improperly conflates discrimination and retaliation claims. It is true, as Jensen states, that the ICRA's discrimination and retaliation provisions both use the word "because." *See id.* (comparing Iowa Code § 216.11(2) and § 216.6(1)(a)). However, it does not necessarily follow that both ICRA provisions utilize the same causation standard. Despite the use of the word "because" in both provisions, the Iowa Supreme Court has explicitly applied the "significant factor" standard to ICRA retaliation claims, *see Hulme*, 480 N.W.2d at 42, and has applied the "motivating factor" standard to ICRA discrimination claims, *see Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 9, 12-13 (Iowa 2009) (identifying "motivating factor" as the causation standard in ICRA discrimination cases). Like the Iowa Supreme Court's interpretation of the two ICRA provisions, Title VII also applies distinct causation standards for discrimination and

(continued...)

## B. Causal Connection

IOC does not dispute that Jensen's complaint against Jaramillo was protected conduct or that her termination was an adverse employment action. *See* Brief in Support of Motion (docket no. 18-3) at 6 (arguing solely that Jensen's "retaliation claim fails because she cannot establish any causal connection between her protected activity and her termination"). Therefore, the only factor in dispute with respect to Jensen's prima facie showing of retaliation is whether there was a causal connection between the harassment complaint and her termination.

### 1. Title VII but-for causation

As discussed above, in a Title VII retaliation claim, "to show a causal connection, a plaintiff must show that her protected activity was a but-for cause of her employer's adverse action." *Shirrell*, 793 F.3d at 888 (citing *Nassar*, 133 S. Ct. at 2534).

> Direct evidence of [but-for] causation is rarely available, but an inference of causation may be established through indirect evidence, such as the closeness of time between the protected and adverse actions. The more time that elapses between the two events, however, the weaker the inference of causation. Any inference of causation evaporates if the adverse action occurs months after the protected activity. In such cases a plaintiff must present additional evidence of a causal link, which can include "escalating adverse and retaliatory action."

[4](...continued)
retaliation claims. *Compare* 42 U.S.C. § 2000e-2(m) (discrimination provision, stating that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the practice" (emphasis added)), *with* 42 U.S.C. § 2000e-3(a) (retaliation provision, lacking an express "motivating factor" standard). In light of the divergent Iowa case law on retaliation and discrimination claims, and the fact that Title VII likewise creates separate causation standards for each claim, the court does not find that the use of distinct standards is so at-odds with the text of the ICRA to suggest that the Iowa Supreme Court has overruled *Hulme* sub silentio.

*Robinson v. Am. Red Cross*, 753 F.3d 749, 756 (8th Cir. 2014) (internal citations omitted) (quoting *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986-87 (8th Cir. 2011)). A plaintiff may also raise an inference of causation by showing that the managers responsible for terminating her previously knew of, but nevertheless refused to investigate, complaints made by the plaintiff. *See Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1032-33 (8th Cir. 2013).

Initially, the court notes that there was an approximately five-month gap between Jensen's harassment complaint in late-March of 2011 and her termination in late-August of 2011. Because "the adverse action occur[red] months after the protected activity," the temporal proximity between the events raises no meaningful inference of causation. *Robinson*, 753 F.3d at 756. Therefore, Jensen "must present additional evidence of a causal link." *Id.*

Jensen argues that the following evidence raises the requisite inference of causation: (1) Jensen was "targeted" and increasingly scrutinized after Jaramillo was terminated, and Stanford and Taylor were aware of that fact, *see* Resistance at 4-6; and (2) IOC's "official reason" for Jensen's termination, as reflected in the termination report, was based on an inaccurate description of the facts, *see id.* at 6-9.

### a. *Targeting and increased scrutiny*

The record establishes that, after Jaramillo was fired as the result of Jensen's complaint, Jensen heard rumors that she was being "targeted by co-workers," her performance was increasingly scrutinized and Stanford and Taylor warned Jensen that co-worker retaliation was possible. Jensen Appendix at 22-23 (Jensen Declaration); IOC Appendix II at 9-10, 15 (Stanford and Taylor deposition testimony). Further, approximately two and a half months after Jaramillo's termination, Jensen received a written coaching for conduct involving George, who was a "good friend" of Jaramillo's. Jensen Appendix at 8 (Jensen deposition testimony). This evidence is insufficient to create

a genuine dispute with respect to causation.

The written coaching involving George is the only specific instance that Jensen points to as evidence that she was "targeted." As such, it does not evince any "pattern" of action taken against Jensen. *See Heaton v. The Weitz Co., Inc.*, 534 F.3d 882, 888 (8th Cir. 2008). Also, notably, Jensen does not dispute the facts underlying the written coaching, but merely insinuates that George would not have reported her to management if she had not complained against Jaramillo. *See* Jensen Appendix at 8 (Jensen deposition testimony stating that "the fact that [George complained] in the first instance was as a result of the issue with [Jaramillo]"). The fact that Jensen was disciplined for conduct that she actually engaged in does not generate an inference of causation. *See Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 645 (8th Cir. 2009) ("[T]he anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the work-place." (alteration in original) (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 738 (8th Cir. 2004))). Most importantly, the fact that George was a "good friend" of Jaramillo's is irrelevant to the retaliation analysis. There is no evidence that George himself had authority to take any adverse employment action against Jensen. George did not issue the written coaching, Taylor did. *See* IOC Appendix I at 31. Likewise, George did not terminate Jensen, Taylor and Stanford did. Evidence that George "targeted" Jensen or otherwise harbored ill will toward her as a result of her complaint against Jaramillo is insufficient to raise a genuine issue of material fact where, as here, entirely different actors were responsible for the adverse action allegedly caused by Jensen's protected activity. Furthermore, even if George could be viewed to have had a decisive role in the written coaching simply by complaining to management, Jensen does not argue that her written coaching was itself an adverse employment action caused by her protected

conduct,[5] but instead makes such argument with respect to her termination.

Jensen has presented no evidence that any person involved with her termination was connected to Jaramillo or otherwise "targeted" her or harbored retaliatory animus from which to infer causation. Jensen describes Stanford and Taylor as her "supporters" at all times prior to her termination, Jensen Appendix at 25 (Jensen Declaration), and testifies that she detected no retaliatory animus from them, *id.* at 13-14 (Jensen deposition testimony). Indeed, Stanford was involved with the investigation and termination of Jaramillo, IOC Appendix at 63, and both Stanford and Taylor affirmatively instructed Jensen to report to them if she experienced any retaliation from her co-workers, IOC Appendix II at 9-10, 15 (Stanford and Taylor deposition testimony). The evidence thus makes clear that Stanford and Taylor—the managers responsible for her termination—had no retaliatory animus resulting from Jensen's complaint against Jaramillo. Jensen's attempts to assign retaliatory animus to Stanford and Taylor rely solely on speculation and a subjective belief that she developed only after her termination—neither of which generates a genuine dispute with respect to causation. *See, e.g.*, *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 857 (8th Cir. 2012) ("A party's unsupported self-serving allegation that her employer's decision was based on retaliation does not establish a genuine issue of

---

[5] To the extent Jensen's briefing can be interpreted to argue that the written coaching was a materially adverse employment action caused by her complaint against Jaramillo, such argument fails. "A materially adverse action is one that would have 'dissuaded a reasonable worker from making or supporting a claim of discrimination.'" *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). A materially adverse action must produce some level of injury or harm. *See AuBuchon v. Geithner*, 743 F.3d 638, 644 (8th Cir. 2014) (listing various employment actions that are not materially adverse). Here, there is no evidence in the record that Jensen experienced any employment injury or harm as a result of the written coaching. Indeed, Jensen does not even remember receiving the written reprimand, which reasonably suggests that no injury or harm occurred. *See* Jensen Appendix at 9 (Jensen deposition testimony that she "do[es]n't remember" being "written up" based on George's complaint).

material fact." (quoting *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081,1088 (8th Cir. 2011))). Likewise, to the extent Nyland can be viewed to have had a decisive role in Jensen's termination simply by complaining to management, there is no evidence in the record that Nyland had any friendship or other relationship with Jaramillo to raise any inference that her complaint was motivated by the "targeting" or retaliatory animus that Jensen attributes to certain other co-workers.[6]

In sum, the evidence that Jensen has put forth with respect to being targeted and increasingly scrutinized is non-specific and cannot be attributed to the relevant players involved with her termination. Viewed in the light most favorable to Jensen, the evidence establishes that certain co-workers—only two of whom Jensen identifies by name, *see* Jensen Appendix at 12-13—took a less-favorable view of her after Jaramillo was terminated and that they began to circulate rumors. However, there is no direct or circumstantial evidence that Stanford and Taylor, or even Nyland, were included in the group of unnamed co-workers that took issue with Jaramillo's termination. Therefore, Jensen's evidence of targeting and increased scrutiny of her job performance fails to raise any inference of causation and fails to generate a genuine issue of material fact.

### b. *Inaccuracy on termination report*

Following his investigation into Nyland's complaint, Stanford concluded that Jensen spoke with Nyland about her relationship after Taylor ordered her not to do so. IOC Appendix I at 38 (Stanford deposition testimony). The termination report prepared by Taylor conforms to Stanford's conclusions and cites "[i]nsubordination" as the "[t]ype of [e]vent" prompting termination. *See id.* at 59. Jensen argues that she never had a second

---

[6] Like Jensen and Stanford, Nyland was aware that Jaramillo was well-liked by his co-workers. *See* Jensen Appendix at 17 (Nyland deposition testimony); *see also* IOC Appendix I at 18 (Jensen deposition testimony); IOC Appendix II at 10 (Stanford deposition testimony). However, nothing in the record indicates that Nyland was friendly with Jaramillo.

conversation with Nyland after Taylor ordered her not to do so, such that the investigation and termination report were inaccurate. *See* Resistance at 8 (citing Nyland's deposition testimony appearing at IOC Appendix I at 55). Jensen argues that the purported inaccuracy in the termination report was a purposeful "false reason for . . . Jensen's termination," which Stanford and Taylor created to "cover[] for a true, retaliatory motive for . . . Jensen's termination." *Id.* at 6.

Viewed in the light most favorable to Jensen, there is a factual dispute as to whether the termination report accurately reflected Jensen's subsequent conduct toward Nyland. There is evidence that Jensen had one conversation with Nyland where she criticized Nyland's relationship. *See* IOC Appendix I at 52 (Nyland deposition testimony). After this conversation, Jensen discussed Nyland's relationship with Taylor, at which point Taylor told her not to have future conversations with Nyland about her relationship. Jensen Appendix at 4, 24 (Jensen deposition testimony and Jensen Declaration). Nyland testified that there was never a second conversation where Jensen criticized her relationship, but that there was a second conversation where Jensen informed Nyland that she asked Taylor and Kozelka to intervene in the relationship. *See* IOC Appendix I at 55-56 (Nyland deposition testimony). Despite arguing in the Resistance that there was never any second conversation with Nyland, Jensen acknowledges that there was in fact a second conversation. *See* Jensen Appendix at 25 (Jensen Declaration). However, Jensen disputes that the second conversation occurred as Nyland describes, and instead claims that she merely told Nyland about Nyland's partner's reaction to hearing what Jensen said about him and that she then told Nyland that she could not discuss Nyland's relationship any further. *See id.* The termination report is consistent with Nyland's version of the second conversation. *See* IOC Appendix I at 59. Thus, viewing this evidence in the light most favorable to Jensen, Jensen was terminated for a second conversation with Nyland and a second conversation did in fact occur, but there is a factual dispute as to whether the

termination report accurately states the subject of the second conversation.

However, this factual dispute is immaterial. Even assuming that Stanford and Taylor got the facts wrong when deciding to terminate Jensen, this does not, without more, raise an inference of causal connection. "[F]ederal courts do not serve as 'super-personnel departments,' sitting in judgment of an employer's business decisions," absent evidence that such decisions were unlawfully motivated. *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 522 (8th Cir. 2010) (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)). "[E]vidence must do more than raise doubts about the wisdom and fairness of the supervisor's opinions and actions. It must create a real issue as to the genuineness of the supervisor's perceptions and beliefs." *Cty. of Koochiching*, 527 F.3d at 725. Where an employer terminates an employee in reasonable reliance on an investigation into a complaint against the employee, there will be no inference of retaliation. *See Littleton*, 568 F.3d at 645.

There is no evidence in the record that undermines the genuineness of Stanford and Taylor's understanding of Jensen's subsequent actions toward Nyland. The evidence establishes that Stanford investigated Nyland's complaint by taking statements from various people involved, including Nyland and Kozelka. And, while Jensen claims that Stanford did not approach her about her conversation with Nyland, Jensen Appendix at 26 (Jensen Declaration), she does concede that he approached her about her conversation with Taylor, *id.* at 5 (Jensen deposition testimony). Jensen does not point to any evidence that the investigation was conducted in bad faith. Likewise, she does not point to any evidence that Taylor's reliance on Stanford's investigation was unreasonable. Even viewed in the light most favorable to Jensen, the evidence does not directly or circumstantially generate a genuine dispute as to any retaliatory motive behind Stanford and Taylor's alleged misunderstanding of events or the purported factual inaccuracy included in the termination report. Instead, the evidence simply reflects that Stanford and Taylor credited Nyland's

version of events over Jensen's.[7]  Jensen's argument that the inaccuracy was a purposeful cover-up of Stanford and Taylor's retaliatory motives is purely speculative and, as such, does not generate a genuine issue of material fact.  *See Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011).

Jensen also argues that the fact that she was terminated at all raises an inference of causation because she was terminated without "progressive discipline," and it would make "no logical sense" to be terminated for the Nyland incident without first receiving additional warnings.  Resistance at 13.  The fact that IOC terminated Jensen, rather than issuing her a warning, does not generate a genuine dispute as to causation.  The performance document form used by IOC includes check-boxes for multiple degrees of discipline, including various levels of warnings and suspension.  *See* IOC Appendix I at 59.  However, the fact that  multiple degrees of discipline are contemplated by the form is not evidence that IOC had any policy requiring progressive discipline.  Jensen points to no evidence that such a policy exists and, to the contrary, IOC's standards of conduct expressly states that employees "will be subject to disciplinary action up to and including termination" for insubordination.  *Id.* at 28.  Likewise, in Jensen's previous written warning for insubordination toward Nyland in March of 2011, she was informed that the consequences of "uncorrected behavior" may include termination.  *Id.* at 30.  Therefore, there is no evidence of a progressive discipline policy and, even if there was, Jensen has offered no evidence that IOC treated her differently than other employees when it terminated her in contravention of the policy.  *Cf. Dixon v. Pulaski Cty. Sch. Dist.*, 578 F.3d 862, 871 (8th Cir. 2009) (concluding that an employer's violation of its own policy does not support a showing of Title VII pretext if it affects all employees), *abrogated on*

---

[7] In any event, even if Stanford and Taylor credited Jensen's version of the second conversation, they could have nonetheless reasonably determined that the conversation was insubordinate, given that it implicated Jensen's prior criticisms of Nyland's relationship.

*other grounds by Torgerson*, 643 F.3d 1031.[8]  Lacking any evidence to undermine the genuineness of Stanford and Taylor's belief that Jensen's insubordination warranted termination, Jensen fails to raise any inference of causation and fails to generate a genuine issue of material fact.

Jensen has put forth insufficient evidence to show any causal link between her protected conduct and her termination and, as a result, has failed to generate a genuine issue of material fact as to whether her protected conduct was the but-for cause of her termination.  The record, taken as a whole, could not lead a rational trier of fact to find in Jensen's favor on her Title VII retaliation claim.  Accordingly, the court shall grant the Motion with respect to the Title VII claim.

### 2.  *ICRA "significant factor" causation*

Although it is a more lenient standard than but-for causation, the "significant factor" standard poses a "high" hurdle nonetheless.  *See Hulme*, 480 N.W.2d at 42.  To show that protected activity was a significant factor in an adverse employment decision, a plaintiff must show "more than a 'causal link.'"  *City of Hampton*, 554 N.W.2d at 536 (quoting *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 199 (6th Cir. 1986)).  The plaintiff must "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'"  *Zanders v. Nat'l R.R. Passenger Corp*, 898 F.2d 1127, 1135 (6th Cir. 1990) (applying "significant factor" standard to Title VII retaliation claim).

As discussed above, Jensen has put forth insufficient evidence to infer any causal link between her protected conduct and her termination and, as a result, has put forth insufficient evidence that there was "more than a causal link" between the two or that the protected activity was "the likely reason" for her termination.  Therefore, Jensen has failed to generate a genuine issue of material fact as to whether her protected activity was a

---

[8] Under *Dixon*, any argument that IOC's non-adherence to progressive discipline supports a showing of pretext also fails.

"significant factor" in her termination. The record, taken as a whole, could not lead a rational trier of fact to find in Jensen's favor on her ICRA retaliation claim. Accordingly, the court shall grant the Motion with respect to the ICRA claim.

## C. Pretext[9]

If a plaintiff can establish a prima facie case of retaliation, the burden then shifts to the defendant to articulate a "legitimate, nonretaliatory reason" for the adverse employment action, "which the plaintiff must then show was only a pretext for discrimination." *Blackwell v. Alliant Techsystems, Inc.*, 822 F.3d 431, 436 (8th Cir. 2016).[10] "There are at least two routes for demonstrating a material question of fact as to pretext: first, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact; or, second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer." *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015). A plaintiff must show not only that the employer's proffered reason is pretext, but that it is pretext for retaliation—that is, that the employer's stated reason for terminating the plaintiff is false and the true reason is retaliation. *See Dixon*, 578 F.3d at 872 (applying such pretext analysis in the context of Title VII discrimination).

IOC states that it terminated Jensen because her conduct toward Nyland was insubordinate. This states a legitimate and nonretaliatory reason for Jensen's termination. *See Wallace v. Sparks Health Sys.*, 415 F.3d 853, 860 (8th Cir. 2005) ("The employer's burden is not onerous . . . ."). Jensen argues that IOC's proffered reason is pretext both

---

[9] Although Jensen has failed to raise a genuine issue of material fact with respect to causation on her Title VII and ICRA retaliation claims, and although the Motion shall be granted on those grounds, the court will nevertheless proceed to address the issue of pretext.

[10] Neither party argues that pretext is analyzed differently under the ICRA and Title VII. Therefore, on the issue of pretext, the court shall apply Title VII's analytical framework to both claims. *See Banks*, 829 F.3d at 665 n.4.

because it has no basis in fact and because a retaliatory reason more likely motivated the decision to terminate. *See* Resistance at 9-11.

In arguing that IOC's proffered reason is pretext, Jensen relies on her prior argument that Stanford and Taylor were factually incorrect about the events surrounding Jensen's conversation with Nyland. *See id.* Jensen further points to evidence that the disciplinary termination report states that it was prepared on August 26, 2011, but she was informed on August 27, 2011 that the investigation remained ongoing and she was not terminated until August 30, 2011. *Id.* at 10. Jensen contends that this chain of events, bolstered by the fact that her official termination notice was effective as of August 26, 2011, establishes that there was no investigation into Jensen's conduct before she was terminated. *Id.* As such, Jensen argues that IOC's claim that Jensen was terminated due to insubordination has no basis in fact. Additionally, according to Jensen, the purported lack of investigation, combined with the "targeting" and increased scrutiny of her job performance, makes it "implausible" that her termination was motivated by anything except retaliation. *Id.* at 11.

The factual dispute as to whether Stanford and Taylor were incorrect about the events motivating their decision to terminate Jensen, noted above, does not generate a genuine issue of material fact as to whether their decision to terminate her was pretextual as having no basis in fact. The "essential question" is not whether the facts actually raised proper grounds to terminate Jensen, but rather whether Stanford and Taylor honestly and reasonably believed they had proper grounds to terminate Jensen. *See Dixon*, 578 F.3d at 869. Thus, even if Stanford and Taylor were incorrect, and even if an accurate understanding of events may not have shown Jensen to be insubordinate, Jensen has pointed to no evidence in the record suggesting that Stanford and Taylor did not honestly believe she had been insubordinate. *See, e.g.*, *Johnson v. AT&T Corp.*, 422 F.3d 756, 762-63 (8th Cir. 2005) (termination based on employer's honest belief that employee made

bomb threats is not pretext "even if [the employer] had no solid proof that [the employee] made the bomb threats, and even if [the employer] was mistaken in its belief that [the employee] had made the threats"); *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004) ("The key question in a . . . case like this one is not whether [the employee] was truly fighting, but whether the employer really *believed* that he was fighting, such that the termination was based on a non-discriminatory reason."). Even affording Jensen all reasonable inferences by assuming that the investigation concluded on August 26, 2011, such evidence does not establish that there was no investigation. Instead, it establishes that the investigation lasted only three days: from August 24 (when Nyland submitted her complaint) through August 26. The fact that Stanford investigated the incident by soliciting statements from Jensen, Nyland and Kozelka supports a conclusion that Stanford and Taylor honestly believed that Jensen was insubordinate. *See Hitt*, 356 F.3d at 924 (eyewitness reports to an employer support conclusion that employer had honest belief about the reported incident). That the investigation lasted for three days rather than for some longer duration does not undermine the honesty of Stanford and Taylor's belief. Therefore, Jensen has not put forth evidence that IOC's proffered reason has no basis in fact.

Jensen's argument that retaliation was the more likely reason for her termination also fails. The "context" that Jensen describes to support this argument includes the rumors and increased scrutiny of her job performance after her complaint against Jaramillo, as well as the purportedly "sloppy" investigation of the facts resulting in her termination. *See* Resistance at 10-11. However, as described above, Jensen has put forth no evidence that Stanford or Taylor—the managers responsible for her termination—harbored any retaliatory animus to permit an inference that a retaliatory motive is a more likely reason than the proffered legitimate motive. After Jaramillo's termination, Stanford and Taylor indicated that they would not tolerate retaliation. IOC

Appendix II at 9-10, 15. The allusions to "targeting" that appear in the record do not implicate Stanford or Taylor (or even Nyland), but instead implicate two other co-workers and a series of others that Jensen cannot specifically identify. The record is wholly devoid of any evidence of retaliatory motivation as to Stanford or Taylor. Therefore, Jensen has not put forth evidence that retaliation more likely motivated her termination such that IOC's proffered explanation is pretext.

Accordingly, the court finds that, even if Jensen had satisfied her prima facie case, she has failed to generate a genuine issue of material fact as to pretext. The record taken as a whole cannot lead a rational trier of fact to find in Jensen's favor on her Title VII and ICRA retaliation claims. Therefore, the court shall grant the Motion with respect to the Title VII and ICRA retaliation claims.

## *VIII. CONCLUSION*

In light of the foregoing, the court **ORDERS** as follows:

(1)  IOC's Motion to Strike (docket no. 30) is **GRANTED IN PART and DENIED IN PART**.

(2)  Jensen's Motion to Strike (docket no. 33) is **GRANTED**. The Clerk of Court is **DIRECTED** to **STRIKE** IOC's Reply to Jensen's Response to IOC's Statement of Facts (docket no. 27-3).

(3)  IOC's Motion for Summary Judgment (docket no. 18) is **GRANTED**.

The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant. The trial date is **VACATED**.

**IT IS SO ORDERED.**

**DATED** this 17th day of October, 2016.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA